UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 21-cr-711 (TJK) |
| v. : | |
| : | |
| JIA LIU, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jia Liu to 6 months' incarceration, 12 months of supervised release, and $500 in restitution.

I.   **Introduction**

Defendant Jia Liu, a 27-year-old software developer and former member of the United States Marine Corps[1], participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Liu pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1). As explained herein, a sentence of incarceration is appropriate in this case because Liu entered the Capitol building despite obvious signs that he should not, such as alarms blaring, broken glass scattering the floor, and people climbing through windows; Liu entered the building not once, but twice; after being

---

[1] Liu was separated from the Marines in September 2021.

1

inside the Capitol for seven minutes during his first entry, Liu remained on Capitol grounds and eventually re-entered the building for twenty-seven minutes, where he stood at the front of a pack of rioters facing officers and trying to re-breach the Capitol building; Liu only left the building after his second entry when officers forced him out; after January 6, Liu deleted photos and videos from his phone taken on January 6; to date, Liu has not expressed remorse for his actions; and Liu was charged with additional crimes while on bond in the instant case and has pleaded guilty to defrauding the Department of Health and Human Services.

The Court must also consider that Liu's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Liu's crime support a sentence of 6 months incarceration, 12 months of supervised release, and $500 in restitution.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 32 (Statement of Offense), at 1-7.

*Defendant Liu's Role in the January 6, 2021 Attack on the Capitol*

Liu traveled to Washington, D.C. from Queens, New York on January 6, 2021. After attending the former president's "Stop the Steal" rally, Liu marched to the U.S. Capitol building. He approached the building on the West front, amidst violent clashes between police officers and rioters.

Liu made his way to the Upper West Terrace. He approached the Capitol building and took photos of police officers guarding the Capitol building and of rioters climbing through windows

of the Capitol building. Liu entered the building through the Senate Wing Door at 3:24 p.m. He wore a black jacket, black pants, and a sweatshirt with an American flag hood. As Liu entered the building, sirens blared, broken glass scattered the floor, and rioters climbed through windows into the building – obvious signs that the building had been unlawfully breached. As Liu entered, he took a video of the surrounding chaos.

Liu progressed farther into the building toward the Crypt.



*Figure 1: Screenshot of Capitol surveillance footage showing Liu walking towards the Crypt inside the United States Capitol building*

Liu roamed down the hallway of the Capitol building as outnumbered officers struggled to gain control of the building. Eventually, at 3:31 p.m., about seven minutes after entering the building, Liu exited the building by climbing through a window next to the Senate Wing Door.

Liu did not leave the Capitol grounds. Instead, he remained on the Upper West Terrace for about fifteen minutes. He took selfies with police officers behind him, and he roamed the area as rioters chanted and shouted at officers.



*Figure 2: Screenshot of body-worn camera showing Liu on the Upper West Terrace taking a selfie with officers behind him*

While Liu roamed the Upper West Terrace, police officers had regained control of the interior of the Senate Wing Door area. Police officers successfully pushed rioters out of the door and barricaded the windows.

Then, around 3:48 p.m., Liu joined other rioters and approached the Senate Wing Doors for the second time. Rioters remained outside the door but pushed against the officer line to regain access into the building. Liu moved to the front of the crowd of rioters, standing directly in front of the officers attempting to fend off the rioters and maintain hold over the building.



*Figure 3: Screenshot of Capitol surveillance footage showing Liu at the front of a pack of rioters who were attempting to enter the Capitol building*

4

As officers guarded the door to prevent rioters – Liu included – from entering, other rioters attempted to push through the window to the right of the Senate Wing Door. Officers barricaded the window as rioters attempted to break through. Liu remained at the front of the mob of rioters trying to re-breach the Senate Wing Door and watched as officers attempted to fend off the rioters at the window.



*Figure 4: Screenshot of Capitol surveillance footage showing Liu at the front of a pack of rioters watching as officers barricaded the window in attempt to keep rioters out*

By 3:56 p.m., Liu and other rioters had gained ground inside the Senate Wing Door. Liu stood inside the building with rioters behind him. Additional officers came to provide reinforcements.





***Figures 5, 6, 7:*** *Screenshot of Capitol surveillance footage, top, and open source footage, bottom, showing Liu at the front of a pack of rioters trying to gain access into the Capitol building. See Exs. 2-4.*

As Liu stood in the foyer, alarms blared while the officers held their line. Exs. 1, 2. Other rioters screamed at the officers guarding the building, things like "WE WANT THOSE FUCKING TRAITORS!" and "THE ELECTION WAS STOLEN AND WE ALL KNOW IT!" and "FUCK THE DEMS!" Exs. 2-4.

Still at the front of the mob, Liu looked to his left as rioters continued to attempt to break through the window. More officers responded to the area. As rioters pushed back and forth with officers, Liu stood by, refusing to leave.



*Figure 8: Screenshot of Capitol surveillance footage showing Liu at the front of a pack of rioters trying to gain access into the Capitol as more officers respond to the attempted breach*

Eventually, at about 4:22 p.m., after Liu had stood at the front of the mob of rioters inside the Senate Wing Door for 27 minutes, police officers successfully pushed rioters, Liu included, out of the doorway and officers finally re-secured the door.

Liu exited the building but remained in the Upper Northwest Courtyard as officers attempted to corral rioters out of the area.



*Figure 9: Screenshot of body-worn camera footage showing Liu on the Upper West Terrace as officers attempted to corral rioters out of the area*

Officers then pushed rioters off the Upper Northwest Courtyard. Liu eventually left the Capitol grounds.

On January 6, Liu took dozens of photos and videos while on Capitol grounds, including numerous photos of police officers in riot gear guarding the Capitol building prior to his entry into the building. After January 6, the FBI was able to confirm that Liu deleted photos and videos from his phone taken on January 6.

After January 6, Liu did not express remorse for his actions. Instead, he joked about participating in the storming of the Capitol. For example, in June 2021, Liu sent text messages to a friend about attending a "Turning Point USA" chapter event. He joked, "we're not ACTUALLY gonna talk about storming the Capitol Pt. 2." In August 2021, when one of Liu's friends attempted to pay him using electronic transfer of funds, Liu joked that the transaction would not be successful because the bank was dealing with "someone who stormed the capitol."

*The Charges and Plea Agreement*

On October 19, 2021, the United States charged Liu by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). On October 29, 2021,

8

law enforcement officers arrested Liu in Queens, New York. On December 3, 2021, the United States charged Liu by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). On October 20, 2022, pursuant to a plea agreement, Liu pled guilty to Count One of the Information, charging him with violating 18 U.S.C. § 1752(a)(1). By plea agreement, Liu agreed to pay $500 in restitution to the Department of the Treasury. ECF No. 31 at 8 ¶ 10(H).

*Subsequent Arrest and Charges*

After Liu's arrest for his participation in the Capitol siege, and while on bond, Liu was arrested in February 2022 in the Eastern District of New York (EDNY). He was charged with conspiracy to defraud the United States Department of Health & Human Services, conspiracy to defraud the United States Department of Defense, and conspiracy to forge government writings. PSR ¶ 34. Liu and another individual conspired to steal and forge genuine covid-19 vaccination cards. They forged the stolen cards to indicate that unvaccinated persons received the covid-19 vaccination. Liu helped create and distribute these false covid-19 vaccination cards to military members to help them evade vaccination requirements. Liu and his co-conspirator distributed at least 200 false vaccination records and received thousands of dollars in exchange. As part of this scheme, Liu and his co-conspirator also created more than 70 false entries into immunization databases maintained by the New York State Department of Health. PSR ¶ 51. In May 2023, Liu pled guilty to conspiracy to defraud the Department of Health and Human Services, and his sentencing is pending in EDNY.

### III. Statutory Penalties

Liu now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, he faces up to one year of imprisonment and

a fine of up to $100,000. PSR ¶ 81, 98. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV. The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Liu's adjusted offense level under the Sentencing Guidelines as follows:

| U.S.S.G. § 2B2.3(a) | Base Offense Level | +4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Specific Offense Characteristics | +2 |
| U.S.S.G. § 3E1.1(a) | Acceptance of Responsibility | - 2 |
| **Total Adjusted Offense Level** | | **+4** |

*See* ECF No. 37, PSR at ¶¶ 37-45.

The U.S. Probation Office calculated Liu's criminal history as a category I. PSR at ¶ 48. Accordingly, the U.S. Probation Office calculated Liu's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶ 85. Liu's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation. ECF No. 31, ¶ 5(A).

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged over one thousand persons with crimes based on the January 6 riot. This includes hundreds of charges that are subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

V.      **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this first degree misdemeanor case, sentencing is guided by not only the Sentencing Guidelines, but also 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 6 months of incarceration.

A.  **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While fashioning a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Liu, the absence of violent or destructive acts is not a mitigating factor. Had Liu engaged in such conduct, he would have faced additional criminal charges.

In this case, Liu spent a considerable amount of time in the building – about thirty-four minutes – and entered the building on two separate occasions. During his second entry, he stood at the forefront of a mob of rioters attempting to re-breach the Senate Wing Door and windows.

11

Liu witnessed violence between rioters and officers, remained in the vicinity of rioters yelling at police officers, and stood his ground as officers attempted to physically clear rioters out of the area. Liu did not leave until police officers were able to force him and other rioters out. After his participation in the riot, Liu has not expressed any remorse or regret for his actions. Rather, while on bond, he committed additional crimes in the state of New York. Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Liu

Liu works as a software developer. PSR ¶ 54, 68.

Liu previously served in the United States Marines Corps until he was discharged in September 2021. PSR ¶ 74. While Liu's military service is laudable, it renders his conduct on January 6 all the more troubling. As a military member on January 6, Liu should have been well aware that he and others had no right to enter restricted government buildings in the manner that they did. His voluntary decision to storm a guarded government building is nothing short of shocking in light of his military service and training on January 6.

In 2018, the Marines Corps found that Liu violated his integrity by lying during the Marine Corps Combat Fitness Test. In July 2020, the Department of Defense issued a Vetting Risk Operations Center Continuous Evaluation Incident Report, noting that Liu had numerous delinquent debts.

Additionally, as explained above, Liu faces additional criminal charges in the Eastern District of New York for his conduct while on bond in the instant case.

Finally, while on pretrial release, Liu violated the conditions of his release on two occasions by failing to report to his pretrial services officer in the Eastern District of New York,

and by using private internet browsing, further demonstrating his lack of respect for the law. *See* PSR ¶¶ 12, 15.

These facts – particularly Liu's failure to comply with Court-ordered supervision requirements while on pretrial release and additional criminal charges while on pretrial release – support the Government's recommended sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence:* The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-cr-00041 Tr. 10/13/2021 at 37).

13

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

*Specific Deterrence:* Specific deterrence is especially important in this case. Liu's conduct on and following January 6 demonstrate a complete lack of respect for the rule of law. Liu participated in the Capitol riot and made light of that participation following January 6. He has yet to express remorse or regret for his actions. Liu violated his terms of probations twice and was arrested for additional charges while on bond in this case. Liu's actions on January 6 and after demonstrate a need for specific deterrence in the form of incarceration.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged over one thousand individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Liu based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Liu has pled guilty to Count One of the Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

14

similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. O'Brien*, 21-cr-633 (RCL), the defendant entered the Capitol building despite being aware of violence and penetrated the Capitol building all the way to the Speaker's office suite. O'Brien spent approximately 21 minutes inside the building – less time than Liu did. After January 6, O'Brien demonstrated a complete lack of remorse by stating things such as "no regrets" on Facebook. O'Brien had been convicted of two prior misdemeanors. Judge Lamberth sentenced O'Brien to 90 days of incarceration after he pled guilty to one count of violating 18 U.S.C. § 1752(a)(1).

Here, like O'Brien, Liu entered the Capitol building despite being aware that rioters entered the building using force. In fact, during his second entrance, Liu watched as rioters attempted to

16

violently break through the window near the Senate Wing Door and he refused to leave the area despite the obvious signs that officers were attempting to clear rioters out. Like O'Brien, Liu has demonstrated a lack of remorse; for example, after January 6, he made a joke about "storming the Capitol Pt 2." Liu has pled guilty to a felony conviction for criminal conduct while on bond in this case. Liu also has several additional aggravating factors that warrant a longer sentence than O'Brien, including that Liu violated his terms of probations twice; entered the building twice, not once; and was front and center during the rioters' attempt to re-breach the Capitol. As such, a higher sentence is warranted here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

17

F.3d 1093, 1096 (D.C. Cir. 2011).³ Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3); *see also United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Liu must pay $500 in restitution, which reflects in part the role Liu played in the riot on January 6.⁴ Plea Agreement at ¶ 10(H). The riot at the United States Capitol caused approximately $2,881,360.20 in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Liu's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 102.

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Liu to 6 months' incarceration, 12

---

³ The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here, *see* 18 U.S.C. § 3663A(c)(1).

⁴ Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

months of supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney
        D.C. Bar No. 481052

By:    *s/ Ashley Akers*
        Trial Attorney
        MO Bar No. 69601
        Detailed to the U.S. Attorney's Office
        601 D Street NW
        Washington, DC 20001
        Phone: (202) 353-0521
        Email: Ashley.Akers@usdoj.gov

## **CERTIFICATE OF SERVICE**

On this 8th day of June 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

                                             /s/ *Ashley Akers*
                                             Trial Attorney