**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 1:21-cr-00711-TJK** |
| | : | |
| **JIA LIU,** | : | |
| | : | |
| **Defendant.** | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Jia Liu, by undersigned counsel, hereby submits this memorandum in anticipation of sentencing, which is scheduled for June 15, 2023, at 2 p.m. Mr. Liu pled guilty to one count of entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1), a Class A misdemeanor. As Mr. Liu has forthrightly admitted since his arrest, he committed this misdemeanor offense when he entered the United States Capitol without authorization on January 6, 2021, while a joint session of Congress met to certify the Electoral College vote for the 2020 presidential election. For this crime, we respectfully submit, Mr. Liu should receive a probationary sentence with three months' home detention, a punishment on par with the sentences similarly situated January 6 misdemeanants have received in this Court.

**I. The defense has no objections to the PSR and its guidelines calculation.**

Mr. Liu has no objections to the final Presentence Investigation Report. In particular, we do not dispute that his guidelines range is 0-6 months' imprisonment, based on a total offense level of 4 and a criminal history category of I. *See* PSR ¶¶ 45, 48, 82. We concur with the Probation Department that Mr. Liu falls within Zone A of the guidelines sentencing table and, in the Sentencing Commission's view, is eligible for a probationary sentence, including one without home, community, or intermittent confinement. *See* PSR ¶¶ 94-95; U.S.S.G. § 5B1.1(a)(1).

## II. A guidelines sentence of probation with three months' home detention should be imposed under 18 U.S.C. § 3553(a).

In imposing sentence upon Mr. Liu, this Court must consider the relevant factors set forth in 18 U.S.C. § 3553(a). These include the nature and circumstances of the offense and the history and characteristics of the defendant, *id.* § 3553(a)(1); the kinds of sentences available and the sentence recommended by the United States Sentencing Guidelines, *id.* § 3553(a)(3)-(4); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, *id.* § 3553(a)(6). Ultimately, the Court must fashion a sentence that satisfies the purposes of sentencing. These include imposing a punishment that: reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; deters the defendant and the public; protects the public from further crimes by the defendant; and provides the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* § 3553(a)(2). In fashioning this sentence, the Court is bound by "the parsimony principle, a broad command that instructs courts to 'impose a sentence sufficient, but not greater than necessary, to comply with'" those sentencing purposes. *Dean v. United States*, 581 U.S. 62, 67 (2017) (quoting 18 U.S.C. § 3553(a)).

Here, the balance of those factors favor a guidelines probationary sentence. Mr. Liu's crime is not so aggravated as to require imprisonment, as revealed by this Court's sentencing of similarly situated defendants. While we anticipate that the government will argue for imprisonment by emphasizing Mr. Liu's commission of a separate crime while on pretrial release, *see* PSR ¶ 13, Mr. Liu will be adequately punished by the United States District Court for the Eastern District of New York for not only the offense conduct underlying that bail violation, but also the bail violation itself. Additional punishment by this Court for the same

violation of the Court's supervision will therefore be "greater than necessary," contrary to § 3553(a)'s command. Further, Mr. Liu has already spent over a year on strict home confinement because of this violation, a period of time that far exceeds the kind of home detention typically imposed for misdemeanor cases. The lengthy deprivation of liberty renders incarceration unnecessary, as well.

Ultimately, Mr. Liu does not require imprisonment to achieve the ends of sentencing. Rather, a probationary sentence with three months' additional home detention would be sufficient, but not greater than necessary, as § 3553(a)(1) requires.

**A. Nature and circumstances of the offense.**

Mr. Liu's conduct on January 6, 2021 was illegal. He has acknowledged and continues to acknowledge that he broke the law by entering the Capitol knowing he lacked authority to do so. Although Mr. Liu did not act with the purpose of obstructing Congress's proceedings, he recognizes the obstructive effect of his and many others' actions that day: the temporary cessation of our republic's passage of power. He accepts full responsibility for his role in causing that civic harm to our country and democratic system of government.

In assessing the nature and circumstances of Mr. Liu's offense, however, the Court should consider more than the collective injury he and thousands of others caused on January 6. We respectfully request that the Court examine the particular actions Mr. Liu took that day, and consider how they compare to the spectrum of behavior by other individuals who committed similar misdemeanor offenses in the Capitol. Finally, we ask that the Court consider several factors that mitigate the severity of Mr. Liu's offense conduct and diminish the need for an incarceration sentence.

**1. The offense conduct.**

Paragraphs 23-30 of the PSR set forth in general terms how Mr. Liu violated the law. These paragraphs are drawn nearly verbatim from the statement of the offense that Mr. Liu adopted in his guilty-plea allocution. We do not dispute anything in the PSR, but provide here supplemental information that gives more detail and context about what precisely Mr. Liu did in committing this misdemeanor offense.

Mr. Liu drove from New York to Washington, DC, by himself the morning of January 6. After parking and taking the Metro to the Capitol, he attended the Stop the Steal rally on the Ellipse. He heard President Trump's speech, in which the president encouraged his supporters "to walk down to the Capitol," "cheer on our brave senators and congressmen and women," and "demand that Congress do the right thing" Brian Naylor, *Read Trump's Jan. 6 Speech, a Key Part of Impeachment Trial*, NPR (Feb. 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial. Mr. Liu then followed the large crowd that walked from the Ellipse to the Capitol building. He followed the throng onto the Capitol's premises. To do so, he walked past bicycle fencing others had case aside on their march.

At approximately 3:24 p.m., Mr. Liu entered the Capitol through the Senate Wing doors. When he entered the building, rioters had already been present in the building for over an hour. There was no fighting or apparent conflict when he stepped inside. Rather, he followed a stream of people along an ad hoc path that Capitol police had created for people to enter and exit. Mr. Liu followed the boundaries set by the officers and obeyed the officers' directions about where to walk. He walked down a short hallway, obeyed the officers' command to go no further, paused for several minutes, then turned around and left. He exited by following other people who

climbed out of a window next to the door he had entered. He was inside the building for approximately seven minutes.

Mr. Liu subsequently reentered the Senate Wing Doors after the police had cleared the hallway. For 27 minutes, he stood on the doorway's threshold, just inside the building. Initially, Mr. Liu was present between Capitol police officers in front of him and other protestors behind him. He stood there to deescalate tension between several vocal rioters next to him and the police. As he was present at this line of scrimmage between the police and rioters, people amassed on either side; soon, Mr. Liu was caught between dozens of police officers in front of him and scores of rioters behind. The crowd behind him became more raucous, chanting and breaking windows on the doorway's side. Mr. Liu found himself trapped at a bottleneck between the growing standoff.

At approximately 4:17 p.m., President Trump tweeted a video urging the Capitol rioters to go home. *See* The American Presidency Project, *Donald J. Trump Tweets of January 6, 2021*, https://www.presidency.ucsb.edu/documents/tweets-january-6-2021. Mr. Liu saw the video within several minutes of it being posted on his phone. He alerted the other people around him that the president had told them to leave. At that moment, the people around him began to back away from the building. By 4:22 p.m., Mr. Liu and the rest of the crowd left the Capitol, at the police's urging. After exiting the building, Mr. Liu left the Capitol grounds. He returned to his car and drove home to New York that night.

On October 29, 2021, Mr. Liu was arrested for unlawfully entering the Capitol on January 6. He voluntarily submitted to a post-arrest interview, waived his *Miranda* rights, gave a full admission to knowingly entering the Capitol without authorization, and opened the electronic devices that law enforcement seized. He permitted the government to open his

electronic devices even though he knew they contained evidence of his involvement in the COVID-19 fraud conspiracy for which he was subsequently charged in the United States District Court for the Eastern District of New York. *See* PSR ¶ 51; Mot. To Suppress, *United States v. Liu*, No. 22-cr-70 (DG) (E.D.N.Y. Oct. 21, 2022), ECF No. 44. He did so because he wanted to cooperate and recognized that the FBI were acting lawfully pursuant to a judicial warrant.

During the interview, the interrogating FBI agent commended Mr. Liu for being honest; drawing on their shared history as Marines, this agent thanked him for owning up to his mistakes. Mr. Liu also answered the FBI's questions about people he saw in the crowd who appeared to be extremists, based on what they were saying and the clothing and tactical gear they were wearing. Although he did not have specific information about their identities, the FBI agent thanked him for the assistance he was able to provide.

**2. Mr. Liu's offense conduct is less aggravated than other misdemeanor offenders.**

In considering the nature and circumstances of Mr. Liu's conduct, the Court should consider not only what Mr. Liu did, but also how it compares to the conduct of similarly charged misdemeanor offenders. In particular, the Court should assign considerable weight to the absence of multiple aggravating factors that typically appear in these misdemeanor cases.

For example, Mr. Liu did not go far in the Capitol. He did not proceed to sensitive areas cordoned off from the public. He did not attempt to gain access to the House or Senate chambers. He did not wander through the building. The first time he entered, rather, he accessed a single hallway and walked approximately 100 feet in length and then turned around. The second time he entered, he stood only a few feet within the Senate Wing's doorway.

Mr. Liu entered the Capitol over an hour after the initial breach. Unlike many other misdemeanants, he did not enter the building in the wake of violence or after witnessing police

officers be overrun or shoved aside. When he entered the first time, rather, the Capitol police effectively formed a corridor directing him where to go. And when he entered the second time, he did not go much beyond the doorway and left as soon as he learned that President Trump had told his supporters to leave and the crowd behind him dispersed, giving him space to exit.

Not only did Mr. Liu not enter the building under violent circumstances, but he came to Washington, DC expecting to engage in nonviolent disobedience. He did not drive to Washington, DC carrying a weapon or tactical gear. He did not wear or possess any such items while he was present in the Capitol. And he did not engage in any violent conduct or speech. Although he was in proximity to that sort of speech and conduct when he entered the Capitol a second time, PSR ¶ 28, his aim was to deescalate matters. Indeed, as soon as he learned that President Trump had tweeted for his supporters to leave the building, he communicated that message to the people near him, which helped end the standoff with the police.

Unlike many other people charged with January 6 misdemeanor offenses, Mr. Liu did not engage in boastful or defiant speech online before, during, or after the Capitol riot. He did not use his attendance of the rally as a bragging right or an opportunity to condemn Congress, the Capitol police, or people with political views different than his own. He did not make threats to return or do worse if Trump did not retain the presidency. Mr. Liu, rather, limited his expression about January 6 to his presence in the Capitol that day.

Finally, Mr. Liu did not attempt to hide or destroy evidence of his participation in the Capitol riot. Unlike other misdemeanor offenders, he did not destroy the pictures or video he took while he was on the Capitol grounds. He did not attempt to conceal anything about his whereabouts on January 6, 2021. To the contrary, he voluntarily admitted everything he did and

gave the government full access to his electronic files, even though he knew doing so would incriminate himself about felony offenses committed in New York.

All told, the most aggravating elements of Mr. Liu's offense conduct are his two entrances in the Capitol, his collective time in the building, which exceeded 30 minutes, and his proximity to other rioters who made verbal threats and destroyed property. Those factors, however, are not so aggravated as to rule out a probationary sentence. Rather, as discussed below in Part II.C.1, misdemeanor offenders with these facts have been spared imprisonment.

**3. Mr. Liu's cooperation with law enforcement and prompt guilty plea should mitigate his sentence.**

The Court should bear in mind two factors that mitigate Mr. Liu's commission of the crime. First, as previously mentioned, Mr. Liu cooperated with law enforcement's investigation by providing a full and accurate post-arrest statement and providing law enforcement access to his electronic devices. And, second, Mr. Liu agreed to plead guilty at the first instance that he was provided a plea offer from the government. Any delay in his guilty plea was the result of complications arising from his parallel prosecution in the Eastern District of New York, and not because of a reluctance to accept responsibility in this case.

**B. Personal history and characteristics**

Before his arrest in this case, Mr. Liu was a model of American success. He immigrated to this country when he was nine years old, after his parents fled religious persecution in China. He learned English, assimilated into American culture, and ultimately naturalized with his family. He completed high school and attended some college. He joined the Marines and served, in reserve and active capacities, for nearly seven years. He was honorably discharged after completing two active tours, including one in Bahrain and Djibouti, and spending another four years as a reserve. Over the last several years, he developed his own business, Memelope LLC, a

startup software development company that, before his EDNY arrest in February 2022, was growing and increasing in profitability. Before his arrest in this case, his only interaction with law enforcement had been a single speeding ticket, which he resolved. PSR ¶ 49.

Although he has no partner or children, he has his parents and a close community of friends that love and support him. His parents, Robert and Julia Winckelmann, write that Mr. Liu was a model son. His mother, Julia, writes: "He studied hard in school and helped the family with housework. He washed dishes, did laundry, and went shopping with me. He cares a lot about family and other humans." Ex. B at 1. His stepfather, Robert, describes Mr. Liu this way:

> Joseph has always been there for the family when we needed him. Such as fixing my computer and cell phone, showing us how to use new tech, and helping with projects around the house. He would never say no when called upon. One of the most recent was when I suffered a heart condition and needed surgery. For the 4 weeks I was in the I.C.U, Joseph made sure that everything was in order at home and with his mom. Joseph would come to see almost every day for 4 weeks.

*Id.* at 2.

Mr. Liu's misdemeanor unlawful entry of the Capitol is an unfortunate blot on his otherwise commendable lived experience. So, too, is his bail violation and related prosecution in the Eastern District of New York. We acknowledge that these violations of the law are troubling and difficult to square with the upstanding life Mr. Liu otherwise led. As discussed below, however, they do not merit a period of incarceration in this case.

**1. Mr. Liu entered the Capitol with the misguided aim of voicing dissent about the 2020 presidential election.**

Mr. Liu is a patriot at heart. He loves the United States. He joined the armed forces to serve his country. He did so to defend the freedom America offers—its protection of individual speech and belief, and its opportunity for economic mobility. He is forever grateful for the sanctuary that America provided to him and his family. His lived experience, as a child

immigrant whose family settled and thrived here, has taught him the greatness of this country in an unusually deep and profound way.

In his patriotic fervor, however, Mr. Liu believed that he was performing a civic duty by following the urging of President Trump, his preferred candidate and still then the Commander in Chief, to express dissent about Congress's certification of the presidential election. Mr. Liu was convinced that Mr. Trump lost the 2020 election because of fraud—a belief that a substantial minority of the country shared on January 6 and still holds today. *See, e.g.*, Giulia Carbonaro, *40% of Americans Think 2020 Election Was Stolen, Just Days Before Midterms*, Newsweek (Nov. 2, 2022, 5:25 a.m. EDT), https://www.newsweek.com/40-americans-think-2020-election-stolen-days-before-midterms-1756218; Lisa Hagen, *Poll: A Third of Americans Question Legitimacy of Biden Victory Nearly a Year Since Jan. 6*, U.S. News & World Rpt (Dec. 28, 2021, 2:40 p.m.), https://www.usnews.com/news/politics/articles/2021-12-28/poll-a-third-of-americans-question-legitimacy-of-biden-victory-nearly-a-year-since-jan-6; *Press Release: Most Americans Agree Joe Biden Is Rightful Winner of 2020 Election*, Ipsos (Nov. 18, 2020) (showing that 39% of Americans strongly or somewhat agree that 2020 election was rigged), https://www.ipsos.com/sites/default/files/ct/news/documents/2020-11/topline_reuters_post_election_survey_11_18_2020.pdf. And he unlawfully entered the Capitol for the purpose of expressing that conviction to Congress, which he hoped—as the President did, too—would "do the right thing" and not certify the election. Ex. A at 3.

Mr. Liu accepts full responsibility for the illegal acts he took to enter a restricted building without permission to engage in this protest. Further, he acknowledges that although he did not act violently or with an obstructive intent, others did, including the initial rioters who forced their way onto the Capitol grounds and inside the building, as well as the rioters he was near who

damaged property in the Capitol and made threatening statements to law enforcement officers. In considering his personal history and characteristics, however, we ask that the Court bear in mind that Mr. Liu entered the Capitol thinking that he personally was engaging in a form of nonviolent disobedience against a perceived civic injustice. He was not acting as an obstructionist or insurrectionist.

In making this argument, we are not suggesting that Mr. Liu should be excused for unlawful entry. Nor are we minimizing Mr. Liu's conduct. *Cf. United States v. Munchel*, 521 F. Supp. 3d 54, 61 (D.D.C. 2021) (rejecting defendant's characterization of engaging in civil disobedience where he entered Capitol armed with taser and handcuffs and threatened to "break" people). We are merely asking the Court to consider that Mr. Liu acted with a misguided sense of patriotic obligation, and acted with the intent of expressing dissent. Although Mr. Liu's motive is not a defense, we submit that it should mitigate the need for imprisonment. *See generally United States v. Barker*, 546 F.2d 940, 971 n.56 (1976) (Leventhal, J., dissenting) ("[C]onsidering motive as a factor in mitigation of sentence rather than as an exculpating excuse would be the most pragmatic proposal for dealing with such [civil disobedience] offenders" (internal quotation marks omitted)). Mr. Liu is not a brazen or defiant rioter who must be deterred with the full force of the law. Judicial supervision, in the form of probation, is sufficient. No more is needed to ensure this chastened man does not violate the law again.

**2. Mr. Liu's bail violation does not merit incarceration in this case, where he has been subject to 16 months' home detention and will be punished for that violation in his pending parallel federal prosecution.**

We anticipate that the government will emphasize Mr. Liu's bail violation in February 2022, when he was arrested on an indictment in the Eastern District of New York charging him with conspiring to sell COVID-19 vaccination cards to unvaccinated people, including to three soldiers serving in the Marines. *See* PSR ¶ 51. Mr. Liu pled guilty in that case to one count of

defrauding the United States, in violation of 18 U.S.C. § 371. *Id.* He is awaiting sentencing, which is scheduled for September 14, 2023. There, the government will ask for a guidelines sentence of 27-33 months imprisonment. *See* Ex. C ¶ 2 (plea agreement). Although no one knows what sentence will be imposed, a guidelines sentence is possible, even probable.

In the EDNY prosecution, Mr. Liu has stipulated that he continued to be involved in the vaccination card conspiracy after his arrest in this case. Accordingly, we do not dispute that Mr. Liu violated his bail conditions by continuing to engage in the criminal agreement. Despite that, however, we maintain that a period of imprisonment for Mr. Liu's misdemeanor offense is not necessary in this case, for three reasons.

*First*, Mr. Liu's participation in the vaccination-card conspiracy after his October 2021 arrest was relatively minor. Nearly all of Mr. Liu's illegal conduct being prosecuted in EDNY occurred before he was arrested in this case. He violated his bail by giving information to one of his co-conspirators about how to continue the scheme. But the most culpable aspects of Mr. Liu's offense conduct—his obtaining and selling blank or forged COVID-19 vaccination cards—occurred before his arrest in this case. He did not personally sell vaccination cards after October 21, 2021. He had largely—but not entirely—withdrawn from the conspiracy by that point.

*Second*, by the time of sentencing, Mr. Liu will have been subject to 16 months of highly restrictive home detention because of his bail violation. For well over a year, he has been unable to leave his home except for court, attorney visits, medical appointments, and a narrow set of circumstances Pretrial Services has approved. He has been limited to two electronic devices that can connect to the Internet—a tablet and a desktop computer—and has been subject to Pretrial Services' monitoring of them. That electronic monitoring condition has impaired his employment as a software designer by limiting his ability to download necessary programming

software and use clients' proprietary hardware. For over a year, he has been unable to complete contracted projects on his own but has had to pay subcontractors substantial fees to complete the work for him. PSR ¶ 68; Ex. A at 1-2. Mr. Liu had vacated his apartment and move back with his parents. Ex A at 1. His business suffered and he lost the opportunity to apply for new contracts.

Although the bail conditions' limitations on Mr. Liu's movement, computer and Internet access, and ability to earn an income are not as prohibitive as custodial detention would be, they are nevertheless serious restrictions on his liberty that the Court may consider under § 3553(a) as a reason for imposition of a non-incarceration sentence. *See, e.g.*, *United States v. Flowers*, 946 F. Supp. 1295, 1299 (M.D. Ala. 2013) (granting variance and imposing probationary sentence based, in part, on defendant's six months' home confinement while on pretrial supervision). Specifically, these restrictions are a form of punishment that Mr. Liu has already incurred because of his misdemeanor offense and bail violation. *See generally* U.S.S.G. § 5B1.2 (acknowledging that home confinement is form of punishment that enhances probation). We respectfully submit that imprisonment on top of these 16 months' home detention is unnecessary, given the nature of Mr. Liu's offense conduct and the circumstances of his bail violation.

*Third*, Mr. Liu's bail violation will be punished in the Eastern District of New York. Mr. Liu has stipulated that it will enhance his guidelines range under U.S.S.G. § .3C1.3, in a case where a guidelines sentence may be imposed. *See* Ex. C ¶ 2. Moreover, his failure to withdraw from the conspiracy while on pretrial release will play a central part in the EDNY court's determination of the nature and circumstances of that offense under 18 U.S.C. § 3553(a)(1). Because Mr. Liu will be held fully accountable for his pretrial violation in that parallel prosecution, there is a diminished need for this Court to increase punishment for the same conduct. The parsimony principle of § 3553(a), rather, militates against that kind of double

sentencing. The sentence imposed in the EDNY will be sufficient to address the bail violation, and we respectfully request that the Court decline the invitation to punish Mr. Liu twice for the same offending behavior.

**3. Mr. Liu accepts responsibility and is remorseful for his unlawful entry of the Capitol.**

Mr. Liu accepts full responsibility for his conduct on January 6. As noted above, he freely and voluntarily admitted his crime to the FBI when he was arrested. He gave the government full access to his electronic devices, despite knowing they contained incriminating evidence of his distribution of COVID-19 vaccination cards to unvaccinated people. And he disclosed what information he had about extremists he saw on January 6.

Beyond merely accepting responsibility by admitting his guilt, Mr. Liu also feels sincere remorse and shame about how his conduct has affected himself and his family. His family and friends have observed this in him. His stepfather, Robert Winckelmann, reports that his son "has taken a lot of time to think about his mistakes and learned from this. There have been many family discussions over the past several months and Joseph understands his mistakes. Ex. B at 2. Dario Nunez, a childhood friend, writes that "[h]is remorse and sadness over the events of his recent past is creating much mental stress and shame for him to endure," and that this prosecution has "taken a toll on him as he feels that let everyone down." *Id.* at 15. A family friend, Florence Moore, echoes this, writing that Mr. Liu "now feels very embarrassed and upset over the shame his parents are feeling" because of this case and "regrets deeply the sadness he has caused them to endure. *Id.* at 9. "He has spoken very remorsefully and only wants a chance to make amends for his actions so that he can correct the mistakes that he has made." *Id.* And family friend Dianne Muci writes that he "is always speaking of how he could only change the course of events over the past and correct his mistakes." *Id.* at 13.

In his letter attached as Exhibit A to this sentencing memorandum, Mr. Liu describes in his own words the lessons he has learned since January 6, 2021, and the remorse and regret he feels about his unlawful entry of the Capitol that day. His letter closes with a clear acceptance of responsibility, expression of contrition, and commitment to change his ways. He writes:

> I took an oath of office when I enlisted in the United States Marines. In it, I solemnly swore to defend the constitution of the United States from enemies both foreign and domestic as well as to obey the orders of the President of the United States. It was clear to me on January 6, 2021, holding as obdurately as I did onto the beliefs shared by not an insignificant portion of the nation's population concerning the 2020 election, and placing as groundlessly as I did my hopes in the members of the certification process as provided by the Twelfth amendment, that I was duty bound at the President's behest, to peacefully encourage the legislators to "do the right thing."
>
> It took the help of my lawyer and the wisdom of a number of writings for me to reach the conclusion that my personal interpretation of what is best or right for my nation cannot justify actions to violate the law. If it did, we'd all be on a slippery slope where anyone could disregard the laws our nation has passed. All of these laws are parts and parcel of the constitution I swore to uphold. Therefore, proper commitment to my oath means following and defending every law regardless of what my own sense of morality, intention, or personal interpretation or any situation might be.
>
> The person who writes this letter now understands that violating the law, even with good or moral intentions, destroys the rule of law. I understand now that what I did on January 6th, 2021 disrupted order. I recognize that civility requires the awareness of both tangible and intangible damages done to the society as well as voluntary acceptance of all consequences. With these understandings, I forthrightly accept the personal shame and consequences that must follow. I shall honor the terms of my portion of the reparation with contrition. I am prepared for the judgment of this Court, and only ask that Your Honor consider these words, and my change of perspective, when sentencing me.

Ex. A.

In sentencing Mr. Liu, we respectfully request that the Court consider who Mr. Liu is today, nearly two years since his arrest, and not solely who he was and what he did on January 6. Mr. Liu is humbled and reformed. He does not merit imprisonment for this misdemeanor offense. Probation with a term of continued home detention is enough.

**C. A probationary sentence with three months' home detention satisfies the ends of sentencing.**

A probationary sentence with three months' home detention would be sufficient, but not greater than necessary, to achieve the ends of sentencing. In particular, it would be sufficient to afford just punishment, promote respect for the law, and reflect the seriousness of the offense, as evidenced by the punishments this Court has imposed upon similarly situated defendants. 18 U.S.C. § 3553(a)(2)(A). It would also avoid unwarranted sentencing disparities. *Id.* § 3553(a)(6). Finally, the aims of deterrence, incapacitation, and rehabilitation do not require a sentence of imprisonment, as evidenced by Mr. Liu's pretrial release compliance over the last 16 months. *Id.* § 3553(a)(B)-(D). Continued judicial supervision would be sufficient.

**1. A probationary sentence is sufficient to afford just punishment and would not create unwarranted sentencing disparities.**

The Court has the benefit of sentencing Mr. Liu after several hundred January 6 defendants have been sentenced. Defendants in Mr. Liu's position—misdemeanor offenders who lack significant aggravating offense factors—often receive probationary sentences similar to what we propose. To give some examples from this Court's own misdemeanor January 6 sentencings:

- The Court sentenced Jordan Stotts to 24 months' probation, with 60 days' home detention and 60 hours' community service, for entering the Capitol without authorization, shouting in police officers' faces, scaling the Capitol walls, and making incendiary statements on Facebook. *See* Gov't Sentencing Mem., *United States v. Stotts*, No. 21-cr-272 (TJK), ECF No. 24.

- The Court sentenced Kevin Strong to 24 months' probation, with 30 days' home detention and 60 hours' community service, for entering the Capitol without authorization seven minutes after the initial breach, reaching sensitive areas of the House of Representatives, boasting that he came to the Capitol to fight, and deleting photographic evidence of his presence in the building. *See* Gov't Sentencing Mem., *United States v. Strong*, No. 21-cr-114 (TJK), ECF No. 47.

- The Court sentenced Michael Carico to 24 months' probation, with 60 days' home detention and 60 hours' community service, for entering the Capitol without

authorization nine minutes after the initial breach, spending 52 minutes inside, only leaving after being ordered by Capitol police, calling Capitol police officers "traitors," deleting photographs and videos he took, and denying wrongdoing to the FBI. *See* Gov't Sentencing Mem., *United States v. Carico*, No. 21-cr-696 (TJK), ECF No. 33.

- The Court sentenced Gabriel Burress and Madison Pettit each to 18 months' probation with 45 days' home detention, where the defendants entered the Capitol without authorization in the initial crowd that breached the building's east wing, watched other rioters get into physical altercations with police, resisted officers' attempts to maintain barriers to entry, minimized their culpability to the FBI, and did not express remorse before sentencing. *See* Gov't Sentencing Mems, *United States v. Burress & Pettit*, No. 21-cr-744 (TJK), ECF Nos. 45-46.

- The Court sentenced Michael Harden to 18 months' probation with 30 days' home detention, where the defendant unlawfully entered the Capitol and reached sensitive areas of the building, cheered as rioters physically assaulted police officers, and, as a former police detective, knew the dangers he and the rest of the mob were creating. *See* Gov't Sentencing Mem., *United States v. Hardin*, No. 21-cr-280 (TJK).

- The Court sentenced Robert Snow to 12 months' probation, with 60 hours' community service, where the defendant entered the Capitol within two minutes of the initial breach while chaos and violence was occurring around him, encouraged other rioters to enter the building, and stayed inside for 43 minutes and walked all the way to the Capitol's third floor offices. *See* Gov't Sentencing Mem., *United States v. Snow*, No. 22-cr-30 (TJK), ECF No. 26.

Those cases stand in contrast to the misdemeanor prosecutions where this Court has imposed a term of incarceration. In those sentencings, there was a unique aggravating factor or set of factors that distinguished the defendant for additional punishment.

Thus, in *United States v. Pham*, No. 21-cr-109 (TJK), the defendant, an active duty police officer with 18 years' experience, lied to the FBI that he entered the Capitol out of curiosity about the building's architecture and artwork when, in fact, he had cheered on the rioters and penetrated all the way to congressional staffers' offices. *See* Gov't Sentencing Mem., ECF No. 36, at 1-2, 16, 24. Further, he deleted photographs he had taken in the Capitol on January 6 and initially tried to hide those photographs from law enforcement. *Id.* at 12, 16. As a long-tenured police officer, the defendant knew better than most what danger the riot posed and could not be

excused for lying to fellow law enforcement agents. The Court sentenced him to 45 days' imprisonment.

In *United States v. Register*, No. 21-cr-349 (TJK), the defendant entered the Capitol within minutes of the breach, attempted to direct rioters to an alternative entry into the House of Representatives chamber, and wandered around the building to "try[] to be where the action was." Gov't Sentencing Mem., ECF No. 30 at 22-23. He deleted all of the contents of his phone and social media, lied to the FBI about his involvement, and never demonstrated remorse. *Id.* at 23-24. He also had multiple convictions, a probation revocation, and had twice been incarcerated. *Id.* at 25. In summary, the defendant's conduct within the Capitol was more extreme than most misdemeanants, he was deceitful about his conduct, and his prior criminal record and incarceration supported the need for imprisonment to deter him. The government emphasized that this conduct was "more aggravated in nearly every respect" in relation to *Pham*. *Id.* at 33. The Court sentenced him to 75 days' imprisonment.

Finally, in *United States v. Betancur*, No. 21-cr-51 (TJK), the defendant entered the Capitol while on probation for a Maryland burglary offense. Gov't Sentencing Mem., ECF No. 39, at 1. He engaged in a pattern of deceit. He first lied to his probation officer to obtain permission to leave Maryland on January 6, then lied to the FBI about his behavior in the Capitol, and then lied to the Probation Department during his presentence interview. *Id.* at 9-10, 23-25. Unlike many misdemeanor offenders, he attempted to associate himself with an extremist organization, the Proud Boys. *Id.* at 7-8 & n.3. He entered sensitive areas of the Capitol normally closed to the public and helped removed property from the building. *Id.* at 18-22. And he violated the conditions of his pretrial release by returning to Washington, DC, where he racially harassed Metro riders, without permission. *Id.* at 24. For his falsehoods and pretrial release

violations, the Probation Department recommended denial of acceptance-of-responsibility credit. *Id.* at 27-28. The Court sentenced him to four months' imprisonment.

Mr. Liu's conduct on January 6 is no worse than the conduct of other misdemeanants this Court has sentenced to probation. He did not go to sensitive areas of the Capitol; he did not enter the building immediately after its breach or an exchange of violence; he did not shout at or threaten any law enforcement; and he did not boast about his activities before, during, or after the riot. Finally, he did not lie to law enforcement about his illegal activity. To the contrary, he promptly admitted responsibility and cooperated after his arrest, despite exposing himself to additional criminal liability. Since his February 2022 arrest in the Eastern District of New York, he has been compliant with the terms of his pretrial release, except for one early incident involving a misunderstanding regarding his use of an incognito web-browser page on his court-monitored desktop. PSR ¶ 15. In total, Mr. Liu's conduct is comparable to that in the *Carico* and *Snow* cases, where the defendants remained in the Capitol for over 40 minutes and both received probationary sentences with a period of home detention.

Of course, the unique aggravating factor that the government will cite against Mr. Liu is his bail violation for continuing to participate in the EDNY vaccination card conspiracy. But as explained above, that bail violation does not require this Court to impose an additional punishment. Mr. Liu did not personally sell vaccination cards after his arrest. Because of his release violation, he has spent 16 months of highly restrictive home confinement. And he will face a higher guidelines range and probable sentence at his EDNY sentencing not just for his violation conduct but because he violated his pretrial release. A guidelines sentence of probation remains just punishment for Mr. Liu's offense conduct here, notwithstanding the pretrial release violation, which will be fully punished in three months in the Eastern District of New York.

**2. Deterrence, incapacitation, and rehabilitation are sufficiently served by a non-incarceration sentence.**

A probationary sentence is sufficient to achieve the ends of deterrence, incapacitation, and rehabilitation. For the last 16 months, Mr. Liu has been on a highly restrictive form of pretrial release. Other than an early misunderstanding about his ability to use his web browser's incognito function, he has been totally compliant with the terms of his judicial supervision. He does not need to be imprisoned to prevent him from violating the law. A period of continued judicial supervision, with the punishment available under revocation of probation if Mr. Liu were to violate the Court's rules, is enough for this misdemeanor offense.

So, too, is a probation sentence sufficient to achieve general deterrence for Mr. Liu's criminal conduct. This is clear from the Court's imposition of probationary sentences upon similarly situated defendants, including those who, unlike Mr. Liu, did not express remorse, were defiant and boastful about their actions on January 6, or were not forthcoming with law enforcement. Probation with a period of home detention was sufficient for those defendants as a matter of general deterrence. We submit the same conclusion should follow here, as well.

Finally, as to rehabilitation, there are no correctional, education, or vocational services that the Bureau of Prisons can provide Mr. Liu that he cannot obtain more effectively in the community. He is an educated software programmer whose best opportunity for success is continuing his business, which he cannot do in custody. Prolonging the period in which he can develop his software design company by imprisoning him will only hinder his reentry and capacity to contribute to society. This sentencing factor most obviously favors a non-incarceration sentence.

**III. Conclusion.**

Jia Liu's conduct on January 6, 2021, was a crime. He admits it, accepts responsibility, and is remorseful. He deserves punishment. Based on this Court's treatment of similarly situated offenders, probation with a term of home detention is warranted. This is so despite his pretrial-release violation, for which he has already been confined at home for 16 months and can expect a significant term of imprisonment in the Eastern District of New York. His bail violation will be completely addressed at that forthcoming sentencing. We respectfully ask that the Court not punish Mr. Liu doubly for that offense and instead focus on the crime before it: Mr. Liu's misdemeanor unlawful entry of the Capitol of January 6.

The appropriate sentence for that crime is probation with three months' home detention. We respectfully request that the Court impose it when Mr. Liu appears before Your Honor for sentencing.

Respectfully submitted,

/s/

Benjamin Yaster
NY Bar No. 4722567
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1291
Benjamin_Yaster@fd.org
*Counsel for Jia Liu*

Dated: June 8, 2023

**CERTIFICATE OF SERVICE**

On June 8, 2023, I served a copy of the foregoing on counsel of record for the government via the Court's electronic filing system (CM/ECF).

/s/ Benjamin Yaster
Benjamin Yaster
Federal Defenders of New York, Inc.
*Counsel for Jia Liu*